UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY BONDY,

       Plaintiff,                      Civil Action No. 13-14537

v.                                    HON.  STEPHEN J. MURPHY, III
                                    U.S. District Judge
                                    HON. R.  STEVEN WHALEN

COMMISSIONER OF SOCIAL        U.S. Magistrate Judge
SECURITY,

       Defendant.
_____/

## REPORT AND RECOMMENDATION

     Plaintiff brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her applications for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).   For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment [Docket #26] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #23] be DENIED.

## PROCEDURAL HISTORY

     On June 5, 2003, Plaintiff filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI")  alleging disability as of May 14, 2003 (Tr. 49).

-1-

After the initial denial of the claim, Plaintiff requested an administrative hearing, held on

on July 6, 2005 in Detroit, Michigan (Tr. 452). On July 27, 2005, Administrative Law Judge

("ALJ") Sandra K. Rogers determined that Plaintiff was not disabled (Tr. 452-457). Plaintiff

filed a request for review of the administrative decision by the Appeals Council which was

granted on September 13, 2006 (Tr. 443). After a November 2, 2007 rehearing (Tr. 968-

1024), ALJ James N. Gramenos found on January 13, 2009 that Plaintiff was not disabled

(Tr. 431-447). On March 22, 2011, the Appeals Council remanded the case once again, this

time on the basis of "new and material evidence" consisting of an October, 2010

"fibromyalgia" questionnaire completed by Dr. Damilo Dona (Tr. 425-427).

On February 2, 2012, Plaintiff testified at a third hearing (Tr. 1025-1073). ALJ

Gabrielle R. Vitellio presided (Tr. 1025). Plaintiff, represented by attorney, Thomas J.

Bertino, testified (Tr. 1029-1065), as did Vocational Expert, Joseph Thompson (Tr. 1065-

1073). On April 25, 2012, ALJ Vitellio found that Plaintiff was capable of performing her

past relevant work as a greenhouse laborer as well as a significant range of other positions

(Tr. 33-34). She noted that Plaintiff's entitlement to DIB (based on her past earnings)

expired on December 31, 2008 (Tr. 22). On June 21, 2013, the Appeals Council denied

review (Tr. 7-11). Plaintiff filed for judicial review of the final decision on October 30,

2013.

## **BACKGROUND FACTS**

Plaintiff, born September 27, 1963, was 48 when ALJ Vitellio issued her decision

-2-

(Tr. 34, 49). She graduated from high school and worked previously as a teacher's aide, green house worker, and retail clerk (Tr. 70, 75). Her application for benefits alleges disability as a result of fibromyalgia, chest pain, shortness of breath, hand and foot swelling, and "multiple tumors" of the "arms, legs, and back" (Tr. 69).

A. **Plaintiff's Testimony**[1]

Plaintiff offered the following testimony:

She currently lived with husband (Tr. 1029). She had four adult children and seven grandchildren (Tr. 1029-1030). She had not worked since 2003 (Tr. 1030). She last worked as a produce clerk (Tr. 1030). She was terminated after experiencing fatigue and back, neck, leg, and head pain while performing her job duties (Tr. 1030). She had not attempted to find work since 2003 (Tr. 1032). She had been told by a vocational counselor to apply for disability benefits (Tr. 1033). She was unable to work due to symptoms of fibromyalgia, migraine headaches, tumors of the back, stomach, arms, and legs, and fatigue (Tr. 1034). She had been treated for fibromyalgia by Dr. Dona since 2003 (Tr. 1034). She had not taken fibromyalgia medicine since 2010 (Tr. 1034-1035). She experienced the side effect of mental fogginess on Cymbalta and vertigo while on Lyrica (Tr. 1035). She was first treated by a rheumatologist in 2005 (Tr. 1036). Her ability to receive treatment was limited by her husband's health insurance (Tr. 1036).

Plaintiff was able to drive short distances (Tr. 1037). She tried to follow her treating

---

[1]Refers to the February 2, 2012 hearing.

sources' recommendation to exercise by using the backyard pool in the summer (Tr. 1039).

The symptoms of fibromyalgia became worse each year (Tr. 1041).  Although currently, her

husband and adult daughter took care of the household chores, she acknowledged that she

told a physical therapist in 2006 that she did not receive significant help with the housework

from family members (Tr. 1041-1042).  She and her mother took Plaintiff's grandchildren

on outings (Tr. 1046).  She denied babysitting for any of her grandchildren (Tr. 1046).  She

had not received injections for pain and did not use a walking aide (Tr. 1046).  She had

undergone surgery for removal of the skin tumors prior to 2003 but had since been advised

to refrain from further surgery due to the recurring nature of skin tumors (Tr. 1047).  She

experienced daily headaches and intense, migraine-like headaches twice a week (Tr. 1048).

She began mental health counseling in 2005 (Tr. 1050-1051).  She currently took Zoloft for

depression (Tr. 1052).  Zoloft improved her mood (Tr. 1052).  She had not been admitted for

inpatient mental health treatment (Tr. 1052).

In response to questioning by her attorney, Plaintiff testified that she had "good" and

"bad" days, noting that if she "overdid it," she would be exhausted for several days (Tr.

1056).  On a "bad" day, she would spend most of waking hours on the couch (Tr. 1057).  On

a "good" day, she was able to "fold a little laundry" and go out into the back yard (Tr. 1057).

She had been experiencing severe migraines on a semiweekly basis at least as early as 2006

(Tr. 1058).  The migraine headaches typically lasted for several hours (Tr. 1059).  She also

experienced diarrhea, necessitating up to nine trips to the bathroom over the course of a day

(Tr. 1059).  She had experienced fatigue for "many, many years" (Tr. 1061).  Aside from constant fibromyalgia pain, Plaintiff experienced concentrational problems affecting her short-term memory (Tr. 1062).  She had trouble remembering what she read and problems following conversations (Tr. 1062).  She did not experience significant problems following a storyline in a movie (Tr. 1062).  She experienced chronic hand numbness (Tr. 1062).

*The ALJ interjected that Plaintiff claim that she required bathroom breaks up to nine times a day was unsupported by any of the treating records* (Tr. 1063).  *She noted that Plaintiff's allegations of chest pains and heart problems were also unsupported by the records created since the alleged 2003 onset of disability* (Tr. 1063).  *She noted that Plaintiff claim that she experienced chronic and disabling hand numbness was undermined by the fact that Plaintiff had been able to smoke for the past 30 years* (Tr. 1063).

### B.    Medical Evidence

#### 1.  Treating Sources

In May, 2002, Plaintiff sought emergency treatment for chest pain (tr. 135).  A cardiac work up was normal (Tr. 133, 136-143, 194, 199).  The following month, Mark I. Pensler, M.D. diagnosed Plaintiff with mild hypertension and mild Chronic Obstructive Pulmonary Disease ("COPD") (Tr. 193).  The same month, Danilo A. Dona, M.D. noted an unremarkable physical examination except for a working diagnosis of "pulmonary hypertension" (Tr. 165-166).  July, 2002 records show that Plaintiff reported fatigue and breathlessness (Tr. 113).  She denied depression (Tr. 114).  She was diagnosed with

"borderline" hypertension (Tr. 114). Test results were "suggestive of a past Epstein-Barr Virus infection" (Tr. 131). An August, 2002 chest x-ray was unremarkable (Tr. 178). September, 2002 test results were negative for collagen vascular disease (Tr. 111). A physical examination by Dr. Dona was unremarkable (Tr. 159-160). October, 2002 physical examination records by Marc Peters-Golden, M.D. note Plaintiff's report of chest tightness and shortness of breath (Tr. 105-107). The physical examination was unremarkable (Tr. 106, 108). An MRI of the brain was essentially unremarkable (Tr. 119). The same month, tests for pulmonary vascular disease were negative (Tr. 109). Dr. Dona's November, 2002 treating notes state a "working" diagnosis of fibromyalgia (Tr. 150). Dr. Dona's February, 2003 treating records, noted a recent 20-pounds weight gain and "generalized muscle tenderness and tenderness in all joints (Tr. 148). She was prescribed Darvocet (Tr. 148).

In April, 2003, Physician's Assistant ("PA") David Johnson noted Plaintiff's report of multiple lipomas on Plaintiff's limbs and trunk, five of which had already been removed (Tr. 208). December, 2004 imaging studies of the hands were negative for fractures or "bony eronsions" (Tr. 219). January, 2005 treating notes by Hope Clinic state that Plaintiff experienced neck and arm pain but no foot pain and only mild hand pain (Tr. 216). March, 2005 records by Luke Y. Kim, M.D. note that Plaintiff exhibited "diffuse myofascial tightness and trigger points" along with "16 characteristic tender spots consistent with fibromyalgia" (Tr. 217). Plaintiff was advised to increase her dosage of Elavil (Tr. 217). She declined a recommendation for acupuncture treatment "because of a phobia for needles"

(Tr. 217).

Psychological intake records from the following month note Plaintiff's report of depression following a 50-pound weight gain in two years, fights with her "actively alcoholic husband," and decreased energy (Tr. 222). The examiner noted "passive suicidal ideation at times but no plan or action" (Tr. 223). She was assigned a GAF of 40[2] (Tr. 223). She was prescribed Zoloft and referred for psychotherapy sessions (Tr. 223).

In September, 2005, rheumatologist Ali M. Dagher noted Plaintiff's report of fatigue and joint and muscle pain but observed a full range of movement in all joints (Tr. 277). Plaintiff was prescribed Zoloft (Tr. 277). Dr. Dona's notes from the same month state that Plaintiff exhibited normal posture and gait and did not appear to be in acute distress (Tr. 374). Dr. Dona's March, 2006 notes state that Plaintiff exhibited a normal gait and full muscle strength (Tr. 369). April, 2006 treating notes by Dr. Dagher state that Plaintiff "did okay" while using Cymbalta but experienced increased symptoms after exhausting her dosage (Tr. 278). In July, 2006, Plaintiff reported that Cymbalta helped her mood, but noted continued body aches (Tr. 276). Dr. Dagher noted that the muscles, rather than the joints were the source of Plaintiff's pain (Tr. 276). In August, 2006, Plaintiff complained of diarrhea (Tr. 938). Results of a colonoscopy were unremarkable (Tr. 945). An October,

---

[2]A GAF score of 31–40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood." *Diagnostic and Statistical Manual of Mental Disorders—Text Revision* ("*DSM-IV-TR*") 34.

2006 examination was also unremarkable, despite Plaintiff's report of ongoing pain (Tr. 266). Dr. Dagher prescribed Lyrica to be used in conjunction with the Cymbalta (Tr. 266). Psychological records from the following month state that Plaintiff experienced the "stressors" of an alcoholic husband, binge eating, and financial problems (Tr. 300). She attributed her physical symptoms to the stress created by her husband and adult children (Tr. 421). She exhibited an appropriate affect and normal speech (Tr. 306). Plaintiff reported that her husband and adult children did not help her with the household chores (Tr. 416).

January, 2007 psychological treating records note Plaintiff's report that her mood had improved since taking Cymbalta (Tr. 294). She rated her depressive symptoms as a "3" on a scale of 1 to 10 and denied medication side effects (Tr. 294). An evaluation placed her GAF at 48[3] (Tr. 299). Notes from the next month state that Plaintiff had "marked stressors in her life with her medical problems and family problems" (Tr. 326). In March, 2007 psychiatrist Jessica Bright, M.D. assigned her a GAF of 52[4] (Tr. 414). Treating records state that she was not compliant with suggestions to engage in mild exercise (Tr. 414). In May, 2007, neurologist Punitha Vijayakumar, M.D. examined Plaintiff for reports of headaches, noted that Plaintiff exhibited a normal gait and did not appear to be in distress (Tr. 345, 350).

---

[3]

A GAF score of 41–50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *DSM–IV–TR* at 34.

[4]

A GAF score of 51–60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *DSM–IV–TR* at 34.

The same month, an upper GI showed a hiatal hernia but was otherwise negative (Tr. 944). An MRI of the face and neck was negative for abnormalities (Tr. 347).

November, 2008 examination records by Stephen R. Bell, D.O. were unremarkable (Tr. 677). The following month, Plaintiff denied gastric symptoms, appeared "comfortable," and did not exhibit shortness of breath (Tr. 679). In January, 2009, Plaintiff reported that she could not afford fibromyalgia medication "and [did] not want any" (Tr. 682). Ophthalmological examination records note a diagnosis of "narrow angle glaucoma"(Tr. 880). MRIs of the head and neck taken the same month were unremarkable (Tr. 699-700). In May, 2009, Plaintiff denied gastrointestinal problems (Tr. 685). Dr. Bell noted that Plaintiff appeared comfortable (Tr. 687). The same month, she reported symptoms of irritable bowel syndrome to another provider  (Tr. 793). Seetha U. Monrad, M.D. emphasized the need to perform aerobic exercises, noting "a number of different options" she could try (Tr. 794). November, 2009 studies show full strength in the upper extremities (Tr. 792).

In September, 2010, Plaintiff reported that she had been watching her grandchild over the summer (Tr. 801). In October, 2010, Dr. Dona noted that Plaintiff had "a good energy level," slept well, and did not experience shortness of breath (Tr. 714-715). Despite irritable bowel syndrome listed as one of diagnoses, she denied gastrointestinal problems or medication side effects (Tr. 714-715). The same month, Dr. Dona completed a "Fibromyalgia" Residual Functional Capacity Questionnaire, finding that the presence of

-9-

multiple tender points, chronic fatigue, swelling headaches, dizziness, numbness, anxiety mitral valve prolapse, and Carpal Tunnel Syndrome (Tr. 601). He found that Plaintiff experienced bilateral pain in all joints (Tr. 602). He found that physical symptoms would interfere with Plaintiff's job duties on a constant basis and that she was incapable of even "'low stress' jobs" (Tr. 602). He found that she was unable to sit, stand, or walk for more than two hours in an eight-hour workday (Tr. 603). Dr. Dona found that Plaintiff was required to walk for five of every 10 minutes (Tr. 603). He found that she required a sit/stand at will option (Tr. 603). He found that she required unscheduled breaks every 20 minutes, would be required to lie down every 20 minutes, and needed to keep her legs elevated at a 90 degree angle while sitting (Tr. 603). He limited her to lifting 10 pounds on an occasional basis (Tr. 604). He found that she would be unable to perform any fine manipulations, and grasp, turn, twist, and could reach only one percent of the time (Tr. 604). He found that she would be required to miss more than four days of work each month (Tr. 604).

## 2. Non-Treating Sources

An undated Physical Residual Functional Capacity Assessment states that Plaintiff's physical impairments were non-severe, based on the medical records created through October, 2002 (Tr. 97-103). September, 2003 consultative physical examination notes by T. Qureshi, M.D. state that Plaintiff's report of symptoms was consistent with fibromyalgia, but "[n]o functional limitations" were noted (Tr. 213). Plaintiff appeared mildly depressed

-10-

as a result of physical symptoms (Tr. 213).

In May, 2007, psychiatrist Himaja Gummadi, M.D. performed a consultative examination of Plaintiff, noting her reports of crying jags, "hopelessness" and "helplessness" (Tr. 226). She reported that she currently lived with her husband, daughter, son, and granddaughter (Tr. 226). She reported constant pain due to fibromyalgia, noting that her husband did most of the chores (Tr. 226). Plaintiff appeared fully oriented but had trouble "remembering things" (Tr. 227). Her immediate, recent, and past memory appeared intact (Tr. 227). Dr. Gummadi assigned Plaintiff a GAF of 50 due to dysthymia, fibromyalgia, and financial problems (Tr. 227). He found that Plaintiff experienced mild limitation in the ability to understand, remember, and carry out complex instructions or "make judgments on complex work-related decision" (Tr. 230).

The same month, R. Matta, M.D. performed a consultative physical examination, noting Plaintiff's report of fibromyalgia symptoms for over the past 20 years (Tr. 233). She reported headaches four to five times a week and constant neck, shoulder, elbow, wrist, finger, hip knee and ankle pain (Tr. 233). She characterized her pain as a "4 to 8" on a scale of 1 to 10 (Tr. 233). She reported the removal of five lipoma tumors (Tr. 233). She exhibited a full range of motion in all joint groups (Tr. 235-237). She did not exhibit problems performing a range of postural or manipulative activity (Tr. 238). Dr. Matta noted full muscle strength and a normal gait (Tr. 230). He found that Plaintiff could carry up to 20 pounds occasionally, sit for six hours (Tr. 241). He found that Plaintiff was capable of

frequent manipulative and occasional postural activity (Tr. 242-243). He found that Plaintiff should avoid unprotected heights and limit exposure to other environmental hazards to an occasional basis (Tr. 244).

In June, 2011, Dr. Qureshi once again examined Plaintiff, noting the absence of joint swelling (Tr. 607). He observed a normal gait, 4/5 grip strength, and good balance (Tr. 607). He found that Plaintiff could lift up to 50 pounds on a frequent basis; sit for five hours, stand for two, and walk for one hour in an eight-hour workday (Tr. 609). He found that Plaintiff did not require an assistive device (Tr. 609). Dr. Qureshi found that Plaintiff was capable of frequent manipulative and occasional postural activity (Tr. 610-611). He found that Plaintiff could work with various hazards on an occasional basis (Tr. 612).

### C. Vocational Expert

The ALJ described the following hypothetical individual to the VE, using Plaintiff's age, education, and work background:

[L]ight[5] work, simple, routine tasks (Tr. 1065).

The VE testified that past positions of retail stocker and child care worker positions

---

[5]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

would be eliminated due to the need to perform lifting and carrying exceeding the "light" restrictions (Tr. 1066). He found that although the past work as a greenhouse laborer was *typically* performed at the "heavy" level of exertion, Plaintiff had performed the work (as described in her application for benefits) at the light level (Tr. 1066). He thus found that the above hypothetical restriction would not preclude the work of greenhouse laborer, as performed by Plaintiff (Tr. 1066).

The VE found further that the above hypothetical restrictions would also allow for the exertionally light, unskilled work of a janitor (6,000 positions in the state-wide economy); folder (4,000); and cashier (40,000) (Tr. 1066). The VE testified that if the above hypothetical restrictions also included a "sit/stand option," the cashier job numbers would be reduced to 6,000 (Tr. 1066). The VE testified further that the sit/stand option would allow the individual to perform the job of packager (2,000) and assembler (3,000) (Tr. 1067). The VE testified that typically, the individual could expect to take a 30-minute lunch break, two 15-minute breaks, and "one to two" unscheduled breaks of 10 to 15 minutes over the course of an eight-hour work shift (Tr. 1067). The VE testified that if the individual were "away from the workstation in excess of 20 percent over and above the scheduled and unscheduled breaks," all employment would be precluded (Tr. 1067). The VE testified that the need to miss two or more days each month on a consistent basis would be work preclusive (Tr. 67).

In response to questioning by Plaintiff's attorney, the VE testified that if the hypothetical individual were also limited to using the hands 10 percent of an eight-hour

workday for "grasping, turning and twisting objects" or fine manipulative activity, all gainful employment would be precluded (Tr. 1071). The VE testified further that if the individual were limited reaching forward or overhead for one percent of the workday, all jobs would be precluded (Tr. 1071). The VE testified that if the individual was limited to walking half a block, and could "rarely stoop, never crouch, rarely look up and down and turn their head," all work would be precluded (Tr. 1072).

### D. The ALJ's April 25, 2012 Decision

Citing the medical transcript, ALJ Vitellio found that although Plaintiff experienced the severe impairments of "fibromyalgia with headaches and depression" the conditions did not meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (Tr. 25-26).

The ALJ found that Plaintiff experienced mild limitation in activities of daily living and social functioning and moderate limitation in concentration, persistence, or pace (Tr. 26). The ALJ determined that Plaintiff retained the residual functional capacity ("RFC") for unskilled, light work with the following additional limitations: "limited to simple, routine tasks" (Tr. 27). Citing the VE's testimony, she found that Plaintiff could perform her past relevant work as a greenhouse laborer (as previously performed) or, the light, unskilled work of a janitor, folder, and cashier (Tr. 33).

The ALJ discounted Plaintiff's allegations of limitation. She noted that Plaintiff's claim of two migraines a week was undermined by her failure to seek treatment for the

-14-

condition since November, 2007 (Tr. 31). She observed that Plaintiff had not complied with her treaters' multiple recommendations to engage in low impact aerobics for the condition of fibromyalgia (Tr. 31). Citing the therapy records, the ALJ found that Plaintiff's "depression" appeared to be attributable to her husband's drinking problems rather than an independent condition causing work-related limitations (Tr. 31). She noted that Plaintiff reported a noticeable improvement in depression symptoms with the use of Zoloft (Tr. 31).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less than a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of

-15-

whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

Plaintiff makes eight arguments in support of a remand. She argues first that the ALJ deprived her of her due process right to "a full, fair and complete hearing." *Plaintiff's Brief,* 10, *Docket #23.* Second, she contends that the ALJ failed to adequately explain her reasons

for rejecting Dr. Dona's October, 2010 "fibromyalgia" assessment and the opinion of treating psychiatrist Dr. Hanke. *Id.* at 13. In her third argument, she takes issue with with the ALJ's hypothetical question to the VE, contending that the question did not contain all of the relevant limitations. *Id.* at 25. She contends that the omission of a number of her relevant limitations invalidates the Step Five determination that she perform other work. *Id.* Fourth, Plaintiff claims that the alternative Step Four finding that she could perform her past relevant work is not well supported. *Id.* at 30. Fifth, she argues that the determination that her testimony was not credible contains procedural flaws. *Id.* at 33. In her sixth argument, she claims that the ALJ's finding that none her impairments equaled a listed impairment was unsupported by a medical opinion. *Id.* at 38. Seventh, she argues that the ALJ failed to perform a "function by function" analysis of her limitations as required by SSR 96-8p. *Id.* at 39. Finally, she contends that the ALJ's failure to consider all of her impairments in combination constitutes reversible error. *Id.* at 40.

A number of Plaintiff's arguments can be considered in tandem. Argument I. will be considered independently. Likewise Argument II., pertaining to the weight accorded the treating sources will considered by itself. However, Arguments III, IV, V and VII are properly considered together. Likewise, the interrelated arguments VI and VIII will be discussed together.

### A. A Full, Fair, and Complete Hearing (Argument I)

Plaintiff argues first that she was deprived of her due process rights by ALJ Vitellio,

who "discouraged, interrupted, precluded and, summarily, cut off" her attorney's (present counsel Thomas Bertino's) attempt to cross-examine the VE.  *Plaintiff's Brief* at 10-13.  She cites *Padro v. Astrue*, 2013 WL 5719076 (E.D.N.Y. Oct. 18, 2013), in which class member SSA claimants who were denied fully favorable determinations alleged bias by a number of Defendant ALJs.[6]  *Id.*  Plaintiff claims that her rights to a full and fair hearing were denied because counsel was not permitted ask the foundation of the VE's opinion or the VE's qualifications.  *Plaintiff's Brief* at 12.

"Remand for further proceedings is appropriate in cases in which the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the application and regulations." *Manago v. Barnhart* 321 F.Supp.2d 559, 568 (E.D.N.Y.,2004); *Johnson v. Bowen,* 817 F.2d 983, 986 (2nd Cir.1987) (remand ordered "to ensure that the correct legal principles are applied to determination of [the] disability claim); *Reynolds v. Commissioner Of Social Security,* 2011 WL 1228165, *2 (6th Cir. April 1, 2011)(citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir.1995)) (application of "an erroneous legal standard" grounds for remand).  Pursuant to SSR 13-1p, the failure to allow a claimant's counsel to cross-examine a witness constitutes an abuse of discretion.  2013 WL 633939, *3 (January 29, 2013).

Plaintiff's claims that her attorney was not permitted to cross-examine the VE are not

---

[6]Under the terms of the settlement in *Padro*, the defendants denied any wrongdoing.  However, class member claimants were given a rehearing at the administrative level.

well taken.   As Plaintiff acknowledges, over four pages of the transcript are devoted to counsel's cross-examination of the VE (Tr. 1068-1072).   Plaintiff asserts that counsel was "cut off" before completing his questioning.   *Plaintiff's Brief* at 12.   She claims that he was not permitted to question the foundation of the VE's opinion.   *Id.*   However, Plaintiff's argument that she did not receive a "full and fair" hearing fails for multiple reasons. Plaintiff's counsel, while asking to cross-examine the VE, indicated at two separate points that his questions would pertain to the limitations found in Dr. Dona's October, 2010 assessment (Tr.  601-604, 1071-1072).   On the last full transcript page, counsel asked if he could ask two more questions[7] (Tr. 1072).   The ALJ then granted counsel's request to pose additional limitations from Dr. Dona's assessment, then herself posed several additional limitations found in the assessment, directly  after which she concluded the hearing (Tr. 1072-73).   None of the colloquy between counsel and the ALJ suggests that Plaintiff requested or intended to challenge the VE's qualifications or the foundation of the testimony, and counsel's failure to object or make an offer of proof constitutes a waives review.

---

[7]

Given the context of the his request, counsel's statement that he only needed to ask "two" more questions, indicates that they pertained to Dr. Dona's assessment (Tr. 1072).  In his summary judgment brief, he asserts that  he actually wanted to challenge the VE's qualifications.  *Plaintiff's Brief* at 12.  However, in his *Reply,* he contradicts both earlier accounts, stating that wanted to ask *four* more questions pertaining to Dr. Dona's assessment. *Docket #28,* 3.  Given that counsel now has three different versions of the topics and number of questions he  was prevented from asking, it would have been difficult if not impossible for the ALJ to discern how, if at all, she was depriving counsel of his entitlement to a cross examination.  I decline to consider whether counsel deliberately harbored appellate error by accusing the ALJ on the record of depriving him of the ability to cross examine the VE (Tr. 1071).

-19-

Further, Plaintiff's claim that the ALJ failed to ascertain the VE's qualifications or the basis of the vocational testimony is flatly contradicted by the record.   The VE began by declaring that his qualifications were current, that he would be impartial, and that his testimony would be consistent with the information found in the *Dictionary of Occupational Titles* ("DOT") and *Selected Characteristics of Occupations* ("SCO") (Tr. 1065).   Although Plaintiff claims that her rights were violated by counsel's inability to challenge the VE's credentials and foundation (despite any indication in the transcript that he planned or requested to undertake such a line of questioning), she does not currently maintain that the VE was not qualified to testify or plausibly argue that the vocational testimony was erroneous.

Plaintiff's argument that the ALJ cut him off before he finished his questioning is further undermined by the fact that the ALJ  cautioned him four times to avoid repetitious or "futile" questions before she closed the hearing (Tr. 1068, 1069, 1070, 1071).   While Plaintiff's counsel accused the ALJ of preventing him from asking questions after the third caution (Tr. 1071), the ALJ nevertheless allowed counsel to proceed with questioning and acknowledged that counsel's first followup question was not frivolous (Tr. 1071).   Counsel's four-page cross-examination follows lengthy questioning of Plaintiff by both the ALJ and counsel and a thorough direct examination of the VE by the ALJ.   Despite the fact that Plaintiff had already offered testimony at two previous hearings, the hearing at issue lasted a fairly remarkable one hour and sixteen minutes (Tr. 1027, 1073).   Under 5 U.S.C. § 556(d), a claimant may cross-examine a witness "as may be required for a full and true disclosure of

-20-

the facts," but the entitlement to cross-examination is not unlimited.  *See Moore v. Sec. of HHS,* 1992 WL 300849, \*2  (W.D.Mich. August 10, 1992)(*citing Solis v. Schweiker*, 719 F.2d 301, 302 (9th Cir.1983).[8]  Further, as discussed in more detail below, the question of whether the VE was properly questioned is a moot point, given that the ALJ's Step Four that Plaintiff could perform her past relevant work did not require testimony by a VE. *Wright–Hines v.CSS,* 597 F.3d 392, 395 (6th Cir.2010)(ALJ is permitted but not required to elicit VE testimony in making a Step Four finding); 20 C.F.R. § 404.1560(b)(2)).

    Finally, although the ALJ expressed exasperation at the administrative resources used in conducting three separate hearings, nothing in the record suggests that her examination or determination was tainted by bias.  While "[t]he right to a trial by an impartial decision maker is a basic requirement of due process," *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955), the courts do not lightly conclude that a judicial bias claim has been established. *United States v. Microsoft Corp.,* 56 F.3d 1448, 1463 (D.C.Cir.1995). "[E]xpressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women ... sometimes display" do not establish bias. *Liteky v. United States*, 510 U.S. 540, 555-556, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474

---

    [8] Even under a Sixth Amendment Confrontation Clause analysis, judges have broad discretion to limit cross-examination, including limiting "interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986).  "[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* (quoting *Delaware v. Fensterer,* 474 U.S. 15, 20 (1985),

(1994). While Plaintiff elsewhere accuses the ALJ of failing to review the transcript evidence, the ALJ's examination of Plaintiff indicates that the medical and procedural history was carefully reviewed prior to the hearing.

### B. The Treating Source Analysis (Argument II)

Plaintiff argues next that the ALJ erred by failing to properly evaluate the opinions of treating sources Dr. Dona and psychiatrist Dr. Hanke. *Plaintiff's Brief* at 13-25.

An opinion of limitation or disability by a treating source is entitled to deference. "[I]f the opinion of the claimant's treating physician is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue,* 573 F. 3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)(citing *Wilson, supra,* 378 F.3d at 544. Further,

> [i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion.

*Wilson,* at 544 (citing 20 C.F.R. 404.1527(c)(2-6)). The failure to provide "good reasons" for rejecting a treating physician's opinion constitutes reversible error. *Gayheart v. Commisioner of Social Security,* 710 F. 3d 365, 376 (6th Cir. 2013) (citing *Wilson,* at 544-446).

-22-

### 1.  Dr. Dona

Contrary to Plaintiff's argument, the ALJ's rejection of Dr. Dona's October, 2010 is well supported and explained.  The ALJ noted that Dr. Dona's finding that Plaintiff experienced significant exertional, postural, and manipulative limitations (Tr. 601-603) was contradicted by his own records showing a full range of motion, the absence of joint problems, and Plaintiff's acknowledged daily activities (Tr. 31-32).  Dr. Dona's September, 2005 notes state that Plaintiff exhibited normal posture and gait and did not appear to be in acute distress (Tr. 374).  His March, 2006 notes state that Plaintiff exhibited a normal gait and full muscle strength (Tr. 369).  While Dr. Dona's assessment indicates that Plaintiff would be unable to perform personal care or household chores, the ALJ noted that 2006 psychological treating notes showed that Plaintiff  was able to perform most of the household chores (Tr. 31).  Plaintiff faults the ALJ for according greater weight to Dr. Matta's May, 2007 consultative examination findings than Dr. Dona's treating source opinion.  However, contrary to Plaintiff's contention, the ALJ did not simply reject Dr. Dona's opinion because a consultative examiner found a lesser degree of limitation. Rather, the assessment was rejected because it contradicted Dr. Dona's own treating notes, Plaintiff's admitted activities, *and* the consultative findings.

My own review of the transcript indicates that Dr. Dona's October, 2010 "fibromyalgia" assessment was flatly contradicted by contemporaneous treating records. For example, while Dr. Dona's assessment states that Plaintiff would be unable to grasp,

turn, twist, or reach more than one percent of the time and was unable to perform *any* fine manipulative activity (Tr. 604), his own treating notes from the same month state that Plaintiff's energy level was "good" and that she was sleeping well (Tr. 715). Treating records from the previous month state that Plaintiff was able to take care of her grandchild over the summer (Tr. 801). Plaintiff testified that she used the backyard pool to perform aquatic exercises during the summer months (Tr. 1039). With nothing more, I am unable to reconcile Dr. Dona's opinion that Plaintiff was unable to perform any manipulative activities with her admitted ability to use the backyard pool (which would presumably require, at a minimum, the use of a ladder to lower herself into the water) and babysitting a grandchild. Likewise, Plaintiff's stated ability to drive for short distances contradicts Dr. Dona's finding that she was virtually unable to use her hands (Tr. 1037). Finally, I note that while Plaintiff received treatment from Dr. Dona even before the 2003 alleged onset date, Dr. Dona's assessment of implausible and unsupported restrictions was only procured in 2010 after Plaintiff was denied benefits by a second ALJ.

Plaintiff's secondary argument that the ALJ did not grasp the full import of the fibromyalgia-related limitations or cherry picked the transcript for evidence supporting a non-disability determination is not well supported. The ALJ, including fibromyalgia among the severe impairments at Step Two, did not dispute the diagnosis of fibromyalgia, but rather, Plaintiff's unsupported allegations of disabling symptoms. The fibromyalgia diagnosis, by itself, does not give her *carte blanche* entitlement to disability benefits.

*Vance v. Commissioner of Social Sec.,* 260 Fed.Appx. 801, 806, 2008 WL 162942, 4 (6th Cir.January 15, 2008) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996)("'Some people may have a severe case of fibromyalgia as to be totally disabled from working ... but most do not and the question is whether [claimant] is one of the minority.'")(internal citations omitted).   While Plaintiff claims that chronic diarrhea as a result of fibromyalgia, she alleged such symptoms only sporadically and denied gastrointestinal problems on multiple occasions including the same month as Dr. Dona's assessment (Tr. 679, 685, 715-716).   Contrary to Plaintiff's claims, numerous treating and consultative records show a normal gait, range of motion, and muscle tone (Tr. 230, 374, 369, 345, 350, 607).

## 2. Dr. Hanke

Plaintiff faults the ALJ for rejecting Dr. Hanke's finding of a GAF of 40.   *Plaintiff's Brief* at 21-25 (*citing* Tr. 32).   She contends that the ALJ's finding that the symptoms of depression were mostly environmental is not supported by the record.   *Id.*

Again here, the ALJ's discussion of the GAF is well supported and articulated (Tr. 32).   As the ALJ noted, the record as a whole does not support a finding that Plaintiff experienced impairments in reality testing, or major impairments in the ability to interact with others reflective of a GAF of 31 to 40.   Instead, the ALJ gave "great weight" to psychiatrist Dr. Bright's 2006 and 2007 records showing a GAF of 52 reflecting "moderate" limitations in social, occupational, or school functioning.   The ALJ did not err in finding that Dr. Bright's assessment was "generally consistent with the record."   The ALJ noted

-25-

that Dr. Bright's records were consistent with other records showing that Plaintiff was not motivated to exercise and experienced family conflicts but was able to perform a significant range of household chores, drive, and babysit her grandchild. While Plaintiff characterizes the ALJ's conclusion that the condition of depression was environmentally based as "pure speculation," the records support such a conclusion. *Plaintiff's Brief* at 22. The mental health treating notes indicate that Plaintiff's experienced stress as a result of an "actively alcoholic" spouse (Tr. 222). Later treating records note the environmental "stressors" of an alcoholic husband, binge eating, and financial problems (Tr. 300). The same records indicate that Plaintiff herself attributed her physical and mental problems to the failure of her husband and children to contribute to the household responsibilities (Tr. 416, 421).

Plaintiff's argument that the ALJ "overlooked" a portion of the medical records is also without merit. *Plaintiff's Brief* at 23. Plaintiff's claim that the ALJ ignored records pertaining to an earlier-diagnosed heart condition is contradicted by the ALJ's acknowledgment of same (Tr. 25-26). While Plaintiff faults the ALJ for failing to cite portions of the transcript supporting the the allegations, she provides no support for the finding that the ALJ "overlooked" them. To the contrary, the ALJ supplied a remarkably detailed and balanced discussion of the voluminous transcript, including a number of records predating the alleged onset date. In any case, the ALJ was under no obligation to discuss every page of the 1,000-page transcript. *See Kornecky v. Commissioner of Social Security,* 167 Fed.Appx. 496, 508, 2006 WL 305648, *8–9 (6th Cir. February 9, 2006)(

-26-

*citing Loral Defense Systems–Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir.1999)) ("While it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each ... opinion, it is well settled that 'an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party").

### C.  The Vocational Testimony  (Arguments III, IV, V, VII)

#### 1.  The Hypothetical Question and Credibility Determination

Plaintiff attacks various aspects of the vocational testimony.  First, she contends that the ALJ erred by failing to mention the conditions of "severe" depression and fibromyalgia in the hypothetical question to the VE forming the basis of the RFC.  *Plaintiff's Brief* at 25-30.

A hypothetical question constitutes substantial evidence only if it accurately portrays the individual's physical and mental impairments. *Varley v. Commissioner of Health and Human Services,* 820 F.2d 777, 779 (6th Cir.1987).  While "[t]he hypothetical question ... should include an accurate portrayal of [a claimant's] individual physical and mental impairments," the Sixth Circuit has rejected the proposition that the  all of the claimant's maladies must be listed verbatim in the question*.  Webb v. Commissioner of Social Sec.*, 368 F.3d 629, 632 (6th Cir.2004).

Plaintiff's argument that the hypothetical question forming the basis of the job findings was not supported by substantial evidence is not well taken.  She  cites *Cheeks v. CSS,* 690 F. Supp 2d 592, 602 (E.D. Mich. 2009), in support of the argument that the

hypothetical modifiers of "simple and routine" are insufficient to account for her moderate limitations in concentration, persistence, or pace (Tr. 1065). However, it does not follow that such modifiers are inadequate to account for moderate concentrational deficiencies in every case. In *Ealy v. CSS*, 594 F.3d 504 (6th Cir.2010) the Court found that the hypothetical limitations of "simple repetitive tasks" was insufficient to account for the claimant's moderate deficiencies in CPP. However, *Ealy* does not hold that the terms "simple, repetitive," or "simple and routine" are intrinsically inadequate to address moderate concentrational deficiencies. Rather, *Ealy* held that the hypothetical limitations of "simple, repetitive" (drawn from a non-examining medical source) impermissibly truncated the same source's overall conclusion that the claimant should be limited to "simple repetitive tasks to '[two-hour] segments over an eight-hour day where speed was not critical.' " *Id.,* 594 F.3d at 516. The position that "simple and routine" or synonymous terms are always insufficient to address moderate CPP deficiencies (even where the record does not support more stringent limitations) reflects an erroneous reading of *Ealy*. To the contrary, the evidence of record and the ALJ's opinion must be considered in their entirety in determining whether the hypothetical limitations adequately describe the claimant's limitations. *See Schalk v. Commissioner of Social Sec.*, 2011 WL 4406824, *11 (E.D.Mich. August 30, 2011)(*citing Hess v. Comm'r of Soc. Sec.*, No. 07–13138, 2008 WL 2478325, at *7 (E.D.Mich.June 16, 2008))("no bright-line rule" that moderate concentrational deficiencies require the inclusion of certain hypothetical limitations). Here, the ALJ's finding that the

-28-

moderate concentrational deficiencies as a result of chiefly environmental stressors did not require more stringent limitations than "simple and routine" is supported by the record. The ALJ's conclusion that the concentrational limitations allowed for the performance of simple and routine work is also supported by Plaintiff's own acknowledgment that her moods were significantly improved with the use of psychotropic medication (Tr. 294).

Plaintiff's overlapping argument that the hypothetical question ought to have included the conditions of "severe depression" and "severe fibromyalgia" is unavailing for two reasons. First, the ALJ was not required to include Plaintiff's medical conditions in the question to the VE. *See Webb*, *supra,* 368 F.3d at 632. While Plaintiff seems to argue that the finding of the "severe" impairments of depression and fibromyalgia imply that the conditions are automatically disabling, neither the medical transcript nor controlling case law supports such a finding. Second, the term "severe" in SSA parlance simply refers to any condition which would be expected to create more than minimal work-related limitations. 20 C.F.R. § 404.1520(c). As discussed by the ALJ, substantial evidence supports the finding that neither condition precluded "simple and routine" exertionally light work. Likewise, while Plaintiff argues that the ALJ gave short shrift to the "non-severe" conditions of shortness of breath, "chronic diarrhea," a history of heart conditions (predating the alleged onset of disability), and obesity, substantial evidence supports the ALJ's finding that the non-severe impairments did not preclude the performance of exertionally light work.

In her arguments regarding the credibility determination, Plaintiff also faults the ALJ

for declining craft a hypothetical question including all of her professed limitations. *Plaintiff's Brief* at 33-38.   However, the VE was under no obligation to include properly discredited allegations of limitation in hypothetical to VE.  *See Stanley v. Secretary of Health and Human Services*, 39 F.3d 115, 118–119 (6th Cir.1994).   Despite Plaintiff's contention that the rejection of the  professed limitations consisted of mere "boiler-plate used in every unfavorable decision," *Plaintiff's Brief* at 34,  ALJ's credibility determination was well developed and supported (Tr. 30).  The ALJ noted that Plaintiff reported to a treating source that she no longer wished to take fibromyalgia medication (Tr. 30, 682).  The ALJ reasonably found that Plaintiff's allegation of disabling headaches was undermined by the lack of treatment records for the condition (Tr. 30).   The ALJ cited numerous studies showing that Plaintiff exhibited a normal gait and posture and a full range of motion.

### 2.  The Step Four Finding

Moreover, the ALJ's finding that Plaintiff was capable of performing her past relevant work as a greenhouse laborer (as performed) effectively moots her argument that the Step Five job findings by the VE were not supported by substantial evidence. *Plaintiff's Brief* at 30-33.

Plaintiff reported at the time of her application for benefits that her job as a greenhouse laborer required frequent walking but did not require more than 10 pounds lifting, placing the job, as performed at the light exertional level (Tr. 80); 20 C.F.R. § 404.1567(b).

Plaintiff argues that the ALJ erred by failing to procure a DOT job code from the VE for the job of greenhouse laborer. *Plaintiff's Brief* at 30-31. This argument is a red herring. At Step Four of the sequential analysis, the Commissioner first considers whether the claimant has the RFC to perform the functional demands and duties of a past job *as actually performed* by the claimant. SSR 82–61, 1982 WL 31387, *2 (1982). If so, the claimant is not disabled. Here, Plaintiff's own description of the greenhouse position at the time of her application indicates that the job was performed at the light exertional level (Tr. 80). If the claimant is unable to return to the work as actually performed, the Commissioner would *then* be required to consider whether the claimant can perform the functional demands and job duties of the occupation "as generally required by employers throughout the national economy." SSR 82–61. By Plaintiff's own account, her former job as a greenhouse laborer, as performed, fell within the parameters of the RFC for light work. As such, the ALJ was not required to inquire into how the position was generally performed in the national economy. Explained differently, the DOT job code for the greenhouse laborer position (describing the way the position would be *generally* performed) is wholly moot, given Plaintiff's acknowledgment that she previously performed the job at the light exertional level.

Plaintiff's argument that the ALJ inadequately questioned the VE as to the past work is defeated by the fact that the ALJ was not required to use the VE in making the Step Four finding. An ALJ is "not required to solicit testimony from a VE in reaching his [Step Four]

conclusion" that a particular claimant can return to her past relevant work. *Wright–Hines*, *supra,* 597 F.3d at 395; 20 C.F.R. § 404.1560(b)(2). Given Plaintiff's acknowledgment that she performed the former worker at the light level, the VE's testimony regarding the way the job was *generally* performed would be superfluous.

Plaintiff's contention that the ALJ did not perform a "function by function" analysis of the physical and mental residual abilities is without merit. *Plaintiff's Brief* at 39-40. As to the mental limitations, the ALJ stated that her finding of mild limitations in activities of daily living and social function and moderate concentrational limitations were drawn from Plaintiff own account of her daily activities and Dr. Bright's findings (Tr. 26-27). As to the finding that Plaintiff was capable of exertionally light work, the ALJ noted that Plaintiff exhibited no functional limitations at a September, 2003 examination (Tr. 28). The ALJ cited Dr. Dagher's finding of a full range of motion and an October, 2006 EMG showing only mild findings (Tr. 29). She cited consultative findings also showing a normal gait and balance and the ability perform postural activities (including climbing) on a frequent basis (Tr. 29, 31-32). She noted that Plaintiff's claim of disabling headaches was undermined by the lack of treating records for the condition (Tr. 31).

### D. Whether Fibromyalgia Equaled a Listed Impairment (Arguments VI, VIII)

Plaintiff argues that the ALJ's finding that the impairments do not meet or equal a listed impairment is is not supported by "a medical opinion on the issue of equivalence." *Plaintiff's Brief* at 39-40 (*citing Pizzo v. Commissioner of Social Sec.,* 2014 WL 1030845,

(E.D.Mich. March 14, 2014).  While Plaintiff is generally correct that the finding that an impairment does not medically equal a listed impairment should be made by an acceptable medical source, it is the claimant's "burden to prove that he has an impairment or combination of impairments listed in, or medically equal to one listed in, 20 C.F.R. Pt. 404, Subpt, P, App. 1." *Lusk v. Commissioner of Social Sec.,* 106 Fed.Appx. 405, 411, 2004 WL 1791472, 5 (6th Cir. August 6,2004).  "To do so, he must present specific medical findings that his impairment meets the applicable impairment or present medical evidence that describes how his impairment is equivalent to a listed impairment." *Id.* (*citing  Foster v. Halter,* 279 F.3d 348, 354 (6th Cir.2001); *Land v. Sec'y of HHS*, 814 F.2d 241, 245 (6th Cir.1986).  Plaintiff attempts to shift the burden by stating that "[t]he record contains no medical basis for the ALJ's conclusion that [the] conditions do not equal any of the Listings of Impairments." *Plaintiff's Brief* at 38.  While she makes a one-paragraph argument that fibromyalgia *in some instances* may equal Listing 14.09D (inflammatory arthritis), she provides no basis for the contention that her condition medically equals Listing 14.09D or any other Listing.  Plaintiff final argument that the ALJ did not consider the combined effect of her various alleged limitations, *Plaintiff's Brief* at 40-41, is contradicted by the ALJ's full-blown discussion of the "severe impairments," the "non-severe impairments," obesity, and the reasons for rejecting same.

In closing, I note that the transcript amply supports the administrative findings.  While Plaintiff alleges ongoing disability on the basis of fibromyalgia, the transcript shows

-33-

that she ultimately declined all of the treating recommendations for medication, exercise, and acupuncture to address the condition. Her multiple claims of error are countered by substantial evidence in the record. My own review of the medical records shows that the ALJ's summation of the voluminous transcript is well developed and supported. Her determination that Plaintiff is capable of unskilled light work is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #26] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #23] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D.

Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


          s/R. Steven Whalen
          R. STEVEN WHALEN
          UNITED STATES MAGISTRATE JUDGE

Dated: February 4, 2015


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on February 4, 2015, electronically and/or by U.S. mail.

          s/Carolyn M. Ciesla
          Case Manager